UNITED STATES of America, Appellee,

v.

Jack SHAOUL, Defendant–Appellant.

No. 190, Docket 94–1093.

United States Court of Appeals,
Second Circuit.

Argued Oct. 19, 1994.

Decided Dec. 1, 1994.

Michael S. Sommer, Paul G. Gardephe,
Asst. U.S. Attys., Mary Jo White, U.S. Atty.,
S.D.N.Y., New York City, for appellee.

Michael Kennedy, New York City, for defendant-appellant.

Before: LUMBARD, ALTIMARI and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

Jack Shaoul appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York (Dominick L. DiCarlo, *Chief Judge*, United States Court of International Trade, sitting by designation). He makes two contentions on appeal. First, Shaoul argues that the district court abused its discretion in denying his motion for a new trial—a motion based on a juror's inadvertent failure to disclose that the juror's nephew-in-law was an Assistant United States Attorney in the Southern District of New York (who undisputedly was not involved in Shaoul's case). Second, Shaoul claims that the district court's jury instructions on unanimity were plainly erroneous because they opened the door for the jury to return a guilty verdict on his conspiracy and mail fraud charges, even if the jurors did not agree on the factual predicate for each charge. We reject both contentions and accordingly affirm.

## I. BACKGROUND

Jack Shaoul is an antique dealer who was charged with conspiracy and mail fraud in connection with two schemes to defraud two insurance companies out of about $1.2 million. The overwhelming evidence at trial apparently established the following facts. The first scheme involved a false report that art works had been stolen from Shaoul's unattended car, while the other stemmed from water damage to items stored inside his antique shop. The evidence indicated that no art works were ever stolen from Shaoul's car, and that the valuable painting he claimed to have been stolen was not authentic. Similarly, the proof concerning Shaoul's water damage claim apparently showed that Shaoul sought recovery for glass items that had not been damaged by water, and for a fake Winslow Homer watercolor that he had intentionally damaged.

Each of the mail fraud counts set forth a separate mailing by Shaoul that allegedly furthered his fraudulent schemes. These mailings included claim forms reporting that various pieces of artwork had been stolen or damaged, along with documentation to support Shaoul's valuations of those items.

### A. *The Bogus Theft Scheme*

Shaoul owned a painting entitled "Pirate's Cove" which he attributed to the turn-of-the-century American artist Albert Pinkham Ryder. According to Edward Purcell, a former employee at Shaoul's antique shop who testified for the government at trial pursuant to a nonprosecution agreement, Shaoul had tried unsuccessfully to find a recognized Ryder expert to authenticate the painting. At Shaoul's direction, Purcell attempted to sell the Ryder painting at leading auction houses in Manhattan, but those houses never agreed to list the painting for auction.

On January 6, 1991, Shaoul contacted the police to report a theft from his parked car. The police officer who received the complaint included in his report the notation, "petit larceny from auto," indicating that the value of the stolen items was less than $1,000. The report also indicated that Shaoul had reported the theft of three paintings and three vases. By contrast, when Shaoul reported the theft to his insurer, Firemen's Fund, he claimed that four vases and two paintings had been stolen, and sought $715,000 in compensation.

According to Purcell, Shaoul told Purcell the next day that there had been a theft over the weekend. When Purcell asked what had been stolen, Shaoul pointed to the Ryder painting hanging on the gallery wall, and said, "That." Shaoul then told Purcell to hide the painting in a closet, explaining that Shaoul intended to file an insurance claim for the "stolen" painting and certain other works of art.

Purcell testified that he grew nervous about his role in hiding the Ryder painting. He made an anonymous call to the police and spoke with a detective about the bogus theft; he also contacted a lawyer about the matter. Finally, on January 11, 1991, Purcell photographed the Ryder painting—still hidden in-

side the closet in Shaoul's shop—next to that day's edition of the *New York Times*. These photographs established at trial that the Ryder painting was inside Shaoul's shop six days *after* Shaoul claimed that the painting had been stolen.

In other testimony at trial, Purcell described Shaoul's efforts to persuade his insurer that the "stolen" painting was a genuine Ryder worth $1 million. Purcell said that he witnessed Shaoul asking Louis Liskin, his longtime friend, to write a back-dated letter—dated before the alleged theft—expressing interest in purchasing the Ryder painting for more than $800,000. In return, Shaoul allegedly offered Liskin a ten percent share of the insurance proceeds. Shaoul subsequently submitted the letter to his insurer as proof of the painting's value.

Liskin, who also testified at trial pursuant to a nonprosecution agreement with the government, corroborated Purcell's account of the writing and purpose of the back-dated letter. Contrary to his representations in the letter, Liskin testified that he, in fact, believed that the painting was not a genuine Ryder. Indeed, Liskin had co-owned the painting with Shaoul from January 1988 until 1990, when Shaoul purchased Liskin's fifty percent interest in the painting for approximately $18,000.

Finally, an art appraiser who had contacted the leading Ryder expert for Shaoul testified on the government's behalf. The expert had repeatedly advised the appraiser that the painting was not a genuine Ryder, and the appraiser had reported this information to Shaoul.

## B. *The Bogus Water Damage Scheme*

Shaoul's second allegedly fraudulent scheme arose in February 1991, just one month after the alleged theft of art works from his car. This second scheme stemmed from a water leak in Shaoul's antique shop in downtown Manhattan, which had been caused by a contractor.

Ralph Loffredo, Shaoul's neighbor, twice noticed water in and around Shaoul's shop on a Sunday morning in February 1991. Loffredo contacted Shaoul in Long Island, who, in turn, called Purcell, who lived near the shop. On Purcell's arrival, he, Loffredo and another neighbor entered the shop and turned off the water, which had been leaking from a sprinkler head. Loffredo testified that he noticed one wet painting but saw no broken or damaged vases, lamps, or glassware. Purcell and the other neighbor corroborated Loffredo's testimony. Shaoul arrived about a half-hour later, accompanied by his brother-in-law.

Purcell testified that after the two neighbors left the shop, Shaoul instructed his brother-in-law and Purcell to carry out from the back of the shop numerous broken glass vases and lamps, and to spread these items around the damp part of the shop. This glassware allegedly had been broken over time in the shop—before the leak occurred. Nonetheless, Shaoul allegedly had the broken items moved to the wet part of the shop in order to claim that they were damaged by the water leak.

The wet painting observed by Loffredo and Purcell was a watercolor, bearing the purported signature of Winslow Homer, which Shaoul had obtained from Liskin approximately three years before. The leading expert on Winslow Homer told Liskin in 1987 that the work was not a genuine Winslow Homer, however, and Liskin testified that he had related the expert's opinion to Shaoul prior to selling the work to him in 1988 for $1,000. Purcell also testified that, based on his discussions with Shaoul, he believed that Shaoul knew that the watercolor was not a genuine Homer, and that Shaoul had this fact in mind when he doused the already-damaged watercolor after Loffredo and the other neighbor left the shop. Shaoul subsequently claimed that the "Homer"—whose value he placed at $125,000—had been completely destroyed by the water damage. Ultimately, Shaoul's damage claim for the water leak rose to more than $400,000. He submitted these claims to Greater New York Insurance Company, the insurer of the contractor that caused the initial water damage.

Shaoul caused to be mailed to Greater New York appraisals and invoices for the "damaged" glass and paintings. One of the invoices purported to show that Shaoul had

purchased the putative Winslow Homer work from Leah's Gallery in November 1990 for $34,500. Leah Kleman, the owner of Leah's Gallery, testified that she had known Shaoul for ten years as both a friend and a business associate, but that she had never owned or sold any watercolor by Winslow Homer. Kleman further testified that she had never sold any watercolor to Shaoul. According to Kleman's testimony, in February 1991, several months after she had sold Shaoul three porcelain plaques, Shaoul asked her for an invoice reflecting a sale of a Winslow Homer watercolor. Even though no such sale had ever been made, Kleman prepared an invoice as requested by Shaoul. Both Liskin and Purcell testified that Shaoul obtained the purported Winslow Homer watercolor directly from Liskin.

## C. The Jury Instructions and Jury Deliberations

Prior to jury deliberations, the district court gave the following instruction to the jury concerning the overt act element of the conspiracy charge:

> You may not convict unless you are convinced beyond a reasonable doubt that at least one overt act was knowingly and willfully committed by any one of the conspirators in the Southern District of New York....
>
> .... It is not necessary for you to find that all of the overt acts charged in the indictment were committed. Nor is it necessary for you to find that the defendant participated in any particular overt act. It is sufficient if you find that any one overt act, whether or not that overt act is charged in the indictment, was committed by any conspirator in furtherance of the conspiracy.

(Tr. at 1090–91). With regard to the mail fraud counts, the court twice instructed the jury that:

> All you need find is that one or more of these statements or representations were materially false, in order to satisfy the first

element of the crime of mail fraud. You must, however, be unanimous in determining that any one or more of these statements or representations were materially false.

(Tr. at 1101–02). At the end of the charge, the court instructed the jury that "[t]o report a verdict, it must be unanimous." (Tr. at 1112). Defense counsel did not object to these instructions.

During deliberations, the jury sent out a note asking whether all of the overt acts set forth in the indictment had to be proven. The court responded by repeating its instruction that only one overt act need be proven. Defense counsel did not object to the district court's response on this issue. The jury later returned a guilty verdict on all the charged counts,[1] including one count of conspiracy to commit mail fraud, and ten substantive counts of mail fraud.

## D. The Post–Conviction Motions

After the verdict, the prosecution learned that one of the jurors at Shaoul's trial was the uncle of the wife of an Assistant United States Attorney ("AUSA") in the same prosecutorial district. That AUSA had not been involved in Shaoul's case. The prosecution reported that the juror did not disclose his relationship to the AUSA during *voir dire* because "he did not at the time recall that his nephew-in-law was an Assistant United States Attorney nor even consider how his nephew-in-law was employed." (J.A. at 229). The prosecuting attorney promptly notified the court and defense counsel.

Shaoul then moved for a new trial based upon (1) the juror's nondisclosure of his family relationship to an AUSA; and (2) the purported inadequacy of the district court's unanimity instructions to the jury.

At the government's request, the juror appeared at Shaoul's sentencing hearing. Defense counsel began the hearing, however, by waiving his opportunity to examine the juror, based on his belief that the juror's

---

1. The indictment against Shaoul contained nineteen counts, including one count of conspiracy to commit mail fraud, and eighteen substantive mail fraud and wire fraud counts. Prior to trial, on the Government's motion, the court dismissed one mail fraud count and all seven wire fraud counts.

subjective intent was irrelevant to determining whether a new trial must be ordered. Counsel stated: "I don't believe it necessary for us to inquire of the juror for the following reason: Under the McDonough case ... as well as the Langford case ... it seems that the rule of law with reference to a failure to disclose is not whether ... it is intentional. Because I don't suggest that for a [moment]. I have no basis to make such a suggestion. I am not impu[g]ning the integrity of the juror in any way." (S.A. at 4–5). After confirming that defense counsel was waiving his opportunity to examine the juror, Judge DiCarlo excused the juror and proceeded to hear argument on the motion for new trial based solely on the record before the court.

The district court concluded that the juror's relationship to an AUSA not involved in Shaoul's case was insufficient to support a challenge for cause—even if the relationship had been disclosed during *voir dire*. In addition, the district court rejected Shaoul's argument that the unanimity instructions to the jury were plainly erroneous. Accordingly, the district court rejected Shaoul's motion for a new trial on both grounds.

Having denied Shaoul's motion for a new trial, the district court proceeded to sentence Shaoul to forty months of imprisonment on each count of the indictment, to run concurrently, followed by two years of supervised release. The court required Shaoul to pay a fine of $50,000, plus the cost of his imprisonment and supervised release, as well as restitution in the amount of $13,356.90. This appeal followed.

## II. DISCUSSION

### A. *Juror Disqualification*

Shaoul claims that the district court should have granted his motion for new trial because the juror's family relationship to an AUSA would have constituted a valid basis to challenge the juror for cause, had that relationship been disclosed during *voir dire*.

Both parties agree that the juror nondisclosure question is governed by *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). *McDonough* involved a products lia-

bility action, in which a boy's feet were injured by a lawnmower. *Id.* at 549, 104 S.Ct. at 846. During *voir dire*, the jurors were asked whether anyone in their families had ever suffered a severe injury that "resulted in any disability or prolonged pain and suffering." *Id.* at 550, 104 S.Ct. at 847. After the trial was over, defense counsel learned that the son of one juror had been injured in the explosion of a truck tire. When questioned afterwards, the juror reportedly explained that he did not consider that injury to be "severe" or to have resulted in a "disability." *Id.* at 552 n. 3, 104 S.Ct. at 849 n. 3. The Supreme Court held

> that to obtain a new trial in ... a situation [where a juror makes a mistaken response to a question], a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause.

*Id.* at 556, 104 S.Ct. at 850. Clearly, this is a two-part test. In *McDonough*, the Court found that the juror's good faith failure to respond, though mistaken, did not satisfy even the first prong of the test. *Id.* at 555, 104 S.Ct. at 849. Therefore, there was no need to ask the second question: whether the juror could have been challenged for cause.

Shaoul agrees that the *McDonough* test applies here, but argues that he deserves a new trial even if he cannot establish the juror's dishonesty. To this end, he relies on our statement in *United States v. Langford*, 990 F.2d 65, 68 (2d Cir.1993), that "[w]e read [*McDonough's* ] multipart test as governing not only inadvertent disclosures but also nondisclosures or misstatements that were deliberate...." Shaoul somehow reads this to mean that "a new trial is mandated when the correct disclosure would have sustained a challenge for cause," regardless of the juror's honesty in failing to answer the question correctly. (Appellant's Br. at 8.) Such a contorted reading of *Langford* is incorrect, because it would eliminate the threshold requirement of the *McDonough* test: juror dishonesty. The court in *Langford* focused on the second prong of the *McDonough* test

because the defendant had already satisfied the first prong by showing that a juror had deliberately lied about her criminal record.[2] We reiterate that, in order to obtain a new trial, a defendant must show *both* that a juror gave a dishonest answer, *and* that the correct answer would have provided a basis for the defendant to challenge the juror for cause.

■ At Shaoul's sentencing hearing, the government made the juror in question available for questioning by both parties and by the court. Defense counsel, however, unambiguously waived any right to an evidentiary hearing in the matter. Moreover, defense counsel explicitly conceded the good faith of the juror on the record before the district judge. Faced with such a concession, the district judge correctly concluded that Shaoul had failed to satisfy the threshold requirement of the *McDonough* test—that "a juror failed to answer honestly a material question on *voir dire.*" *McDonough,* 464 U.S. at 556, 104 S.Ct. at 850.

■ Based on the record before us, Shaoul also cannot satisfy the second part of the *McDonough* test—that the juror could have been challenged for cause. Shaoul argues that the district court should have found the juror to be "impliedly biased," due *solely* to the juror's family ties to an AUSA in the Southern District of New York who was not involved in Shaoul's case. A defendant may certainly exclude such jurors by the use of peremptory challenges, but he has no basis for arguing that a district court is required to sustain such a challenge for cause.

All of the cases relied upon by Shaoul for the contrary proposition are inapposite. For example, Shaoul relies on *United States v. Colombo,* 869 F.2d 149, 150 (2d Cir.1989), for his assertion that "a juror's familial relationship to the prosecution mandates excusing the juror for cause based upon implied bias." (Appellant's Br. at 8). That misstates *Colombo's* holding. In *Colombo,* this Court rejected as overbroad a contention by the government that a juror could *never* be challenged for cause based on his family relation-

ship with a prosecutor. We asserted in *dicta* that "the sisters-in-law of some attorneys—for example, attorneys actually involved in this investigation and prosecution—should not be jurors in this case." 869 F.2d at 152. There is nothing in this statement that supports the proposition that relatives of prosecutors *not* involved in the defendant's case—such as the juror in the case at bar—should be excluded *per se* from serving as jurors.

Shaoul has conceded that deliberate juror misconduct did not exist. Nevertheless, almost all of the other cases cited by Shaoul involve deliberate juror misconduct. *See, e.g., Burton v. Johnson,* 948 F.2d 1150, 1159 (10th Cir.1991); *United States v. Scott,* 854 F.2d 697, 698 (5th Cir.1988); *United States v. Perkins,* 748 F.2d 1519, 1533 (11th Cir.1984). The government, on the other hand, draws our attention to a handful of cases where similar inadvertent nondisclosures by jurors were excused. *United States v. Ortiz,* 942 F.2d 903, 909 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2966, 119 L.Ed.2d 587 (1992); *United States v. Sockel,* 478 F.2d 1134, 1136–37 (8th Cir.1973); *Carpintero v. United States,* 398 F.2d 488, 490 (1st Cir. 1968). The primary case relied upon by the district court was *Garland v. United States,* 182 F.2d 801 (4th Cir.1950), in which the court stated:

> The argument that the verdict should have been set aside because a sister of one of the jurors was married to an uncle of the Assistant United States Attorney who presented the case is so lacking in all merits as not to justify discussion. It is well settled generally that relationship to the prosecuting attorney does not disqualify a juror.

*Id.* at 802. We believe that *Garland*—a 44-year–old case of another Circuit which this Court has never cited with approval—paints with too broad a brush. Inasmuch as *Garland* apparently would disallow *all* challenges for cause based on family relationships between jurors and prosecuting attorneys, the *Garland* standard does not make the distinction—a distinction we believe to be central—whether the prosecutor at issue is *involved*

---

**2.** In *Langford,* the Court of Appeals upheld a finding of the district court that the juror was not

prejudiced in any way against the defendant, and accordingly affirmed the denial of a new trial.

or *uninvolved* in the case in which the juror is eligible to sit. By contrast, *Colombo* does make this distinction. *See* 869 F.2d at 152. To the extent that *Garland* differs from *Colombo* in this regard, then, we stand by the latter.

## B. *The Unanimity Charge*

■ Because Shaoul objects to the jury instructions for the first time on appeal, we review those instructions for "plain error." FED.R.CRIM.P. 30, 52(b); *United States v. Lopez*, 937 F.2d 716, 725 (2d Cir.1991). The error must be "so 'plain' [that] the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982).

■ Shaoul argues primarily that Judge DiCarlo did not properly instruct the jury that they had to be unanimous regarding (1) *which* overt acts took place in furtherance of the charged conspiracy, and (2) *which* alleged misrepresentations by Shaoul were materially false and thus supported the mail fraud charges.[3] Shaoul argues that the court's instructions left the jury confused and greatly increased the likelihood of their returning a less-than-unanimous verdict.

■ After instructing the jury about the mail fraud and conspiracy charges, as described earlier, the district court gave the following general unanimity instruction: "To

report a verdict, it should be unanimous." (Tr. at 1112).

■ Assuming for the argument only that the jury did have to agree on which particular overt act Shaoul committed and which particular misrepresentation he made, we nevertheless find that the district court was required only to instruct the jury generally about its duty to return a unanimous verdict. *United States v. Harris*, 8 F.3d 943, 945 (2d Cir.1993) ("While a specific charge regarding unanimity of the factual basis for the verdict may be given, it is not error to refuse to give such a charge."); *United States v. Schiff*, 801 F.2d 108, 114–15 (2d Cir.1986) ("A general instruction on unanimity is sufficient to insure that ... a unanimous verdict is reached, except in cases where the complexity of the evidence or other factors create a genuine danger of jury confusion.") (internal citations omitted), *cert. denied*, 480 U.S. 945, 107 S.Ct. 1603, 94 L.Ed.2d 789 (1987); *United States v. Natelli*, 527 F.2d 311, 325 & n. 11 (2d Cir. 1975) (citing *United States v. Remington*, 191 F.2d 246, 250 (2d Cir.1951) (L. Hand, A. Hand, Swan, JJ.), *cert. denied*, 343 U.S. 907, 72 S.Ct. 580, 96 L.Ed. 1325 (1952)), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976). Indeed, the general unanimity charge that we reviewed and upheld in *Harris* closely resembles the charge given by the district court in the case at bar. *Compare Harris*, 8 F.3d at 945 n. 2 (reporting that the district judge instructed the jury, "your verdict must be unanimous on

---

**3.** Shaoul raises two additional challenges to the jury instructions. Both are without merit.

First, he argues that the mail fraud schemes laid out in the jury charge varied from those charged in the indictment. According to appellant, the indictment alleged two misrepresentations in the first scheme, whereas the jury instructions let the jurors pick from four misrepresentations; and the indictment alleged two misrepresentations in the second scheme, whereas the jury charge listed three. However, the jury instructions merely listed Shaoul's alleged falsehoods with slightly greater particularity than did the indictment. Accordingly, we find no variance of significance between the indictment and the charge.

Second, Shaoul argues that the court gave ambiguous instructions about the mailing element of the charged offenses. The court accurately restated the parties' stipulation that "the fact of each of these mailings is not in dispute."

(Tr. at 1106). Shaoul argues that this statement suggested to the jury that they did not need to find that each mailing was undertaken in order to effect an object of the conspiracy, and that each was foreseeable by Shaoul. Read in the context of the entire jury charge, however, the district court's statement implied nothing of the sort. Shaoul also finds evidence of jury confusion about the mailing element in a note that the jurors sent to the judge during deliberations, asking whether guilt on one count in each scheme entailed guilt on all counts in that scheme. However, a question about the interplay among the various counts does not, standing alone, indicate any jury confusion about the elements of the individual counts. We therefore reject Shaoul's second contention as unfounded.

In short, Shaoul has failed to demonstrate that the jury instructions were erroneous—let alone plainly erroneous—in either of the above respects.

each count") *with* Tr. at 1112 ("To report a verdict, it should be unanimous."). Even in circumstances where it might have been advisable as a matter of sound policy to give "specific" unanimity instructions,[4] we have held that failure to give such instructions does not constitute plain error. *United States v. Peterson,* 768 F.2d 64, 68 (2d Cir.), *cert. denied,* 474 U.S. 923, 106 S.Ct. 257, 88 L.Ed.2d 264 (1985).

## CONCLUSION

To summarize:

1. By conceding the good faith of a juror who failed to disclose his family relationship to a prosecutor who was not involved in the present case, Shaoul failed to show that the juror answered a question dishonestly during *voir dire.* Accordingly, Shaoul did not satisfy the first prong of the *McDonough* test.

2. Because the district court included a general instruction on jury unanimity, there was no error, let alone plain error, in the jury charge.

Accordingly, the district court correctly denied Shaoul's motion for a new trial. The judgment is affirmed.

---

**4.** Where the jury must agree on the factual predicate underlying a criminal offense, a district court might give a "specific" unanimity instruction similar to the one that follows:

(1) One more point about the requirement that your verdict must be unanimous. Count ___ of the indictment accuses the defendant of committing the crime of ___ in either one of two different ways. The first is that he ___. The second is that he ___.

(2) The government does not have to prove both of these for you to return a guilty verdict

on this charge. Proof beyond a reasonable doubt of one or the other is enough. But in order to return a guilty verdict, all twelve of you must agree that the same one has been proved. All of you must agree that the defendant ___. Or all of you must agree that he ___.

Pattern Criminal Jury Instructions of the District Judges Association of the Sixth Circuit, Instruction No. 8.03A (1991), *reprinted in* Modern Federal Jury Instructions: Criminal Pattern Jury Instructions 6–142 (1991).