**UNITED STATES of America,**
**Appellee,**

v.

**Angel E. BAUTISTA, Defendant,**

**Gilberto Jose Bueno, Jr., Defendant**
**Appellant.**

**Docket No. 00–1465.**

United States Court of Appeals,
Second Circuit.

Argued May 23, 2001.

Decided June 5, 2001.

365 (1985) (describing New York's system of "comparative causation").

Lisa A. Peebles, Federal Public Defender's Office, Syracuse, N.Y. (Alexander Bunin, Federal Public Defender, on the brief), for Defendant–Appellant.

Elizabeth S. Riker, United States Attorney's Office for the Northern District of New York, New York, N.Y. (Daniel J. French, United States Attorney, and John G. Duncan, Assistant United States Attorney, on the brief), for Appellee.

Before: JACOBS and LEVAL, Circuit Judges, and MURTHA, District Judge.[*]

PER CURIAM.

Gilberto Jose Bueno, Jr. was found guilty by a jury in the United States District Court for the Northern District of New York (Munson, J.) of distributing and possessing with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1), and was sentenced principally to 60 months in prison. On appeal, he challenges: (i) the admission into evidence of an informant's prior written statement, (ii) the district court's decision to sustain objections during the defense summation to an argument about the government's lack of evidence, (iii) the giving of a jury instruction on conscious avoidance, and (iv) the government's failure to provide Rule 404(b) notice as to prior bad acts allegedly committed by Bueno and blurted out by a prosecution witness. Because each of these claims either lacks merit or was harmless in light of the overwhelming evidence against Bueno at trial, we affirm Bueno's conviction.

**BACKGROUND**

The key issue at trial was the extent of Bueno's knowledge of and involvement in an agreement to distribute 600 grams of heroin in Watertown, NY. The relevant events involved four persons in addition to Bueno: co-defendant Angel Bautista (who pled guilty before trial); undercover DEA Special Agent Ralph Reyes; and two paid

informants, Jacinto German and Marcos DeLaCruz.

Trial testimony established that on November 23, 1998, Bueno asked Bautista if he knew anyone who wanted to purchase heroin. Bautista contacted German to try to find a buyer. German (a DEA informant) suggested that Bautista get in touch with "Tony," who was actually Agent Reyes. In a recorded conversation, Bautista told Agent Reyes that his (unnamed) principal could supply 600 grams of heroin at a price of $125 per gram.

On December 1, 1998, Bueno, Bautista, German and DEA informant DeLaCruz met at a Brooklyn restaurant. The defense emphasized at trial that neither informant was wired for this meeting. At this meeting, it was arranged that Tony would purchase as much as 800 grams of heroin for $125 per gram, that the deal would be done in Watertown, and that Bueno, Bautista, German and DeLaCruz would meet at Jimmy's Bronx Café at 6:00 am on December 3 to drive there. It was agreed that Tony would pay Bueno $2000 for transporting the heroin upstate, and that Bueno would split this amount with Bautista. DeLaCruz contacted Agent Reyes after the meeting to tell him about the arrangements. The next day, Bueno told DeLaCruz that he could only obtain 600 grams of heroin, and DeLaCruz conveyed this information to Agent Reyes.

The defense introduced evidence that Bueno was a trained chauffeur who drove 40 to 70 hours per week for a car service in Queens. But when Bueno showed up with DeLaCruz on the morning of December 3, he was driving his wife's car. (Bautista and German arrived by taxi.) The government adduced testimony from the

[*] The Honorable J. Garvan Murtha, of the United States District Court for the District of Vermont, sitting by designation.

informants that Bueno decided to transport the heroin in his own car, alone, because (i) he thought it less likely that he would be stopped if he were alone, and (ii) if he were stopped, he could use his credential as a New York City auxiliary police officer to avoid additional investigation.

Bueno testified in his own defense that he was hired to chauffeur Bautista, DeLaCruz and German to Watertown; that he learned only when he was scheduled to leave that he would be driving alone, behind the others; that he did not know that there was a package in his car until he stopped for gas (well into the drive); and that he never knew that the package contained narcotics.

When the two cars reached Watertown, they parked at a gas station to await Tony, and Bautista got into Bueno's car. Bautista testified that Bueno was very nervous, and was convinced that a nearby car with tinted windows was conducting surveillance. Agent Reyes, who was wearing a body wire, got into Bueno's car, at which point Bautista attempted to renegotiate the price with Agent Reyes. Bautista stated that the drive was much longer than anticipated, and that he "had to pay that man [Bueno] $2000 to drive that stuff down here...."

According to the English translation of the taped conversations in Spanish, Bueno declared that he was "freaked out," and told Agent Reyes to "[t]ake that stuff out of here." Agent Reyes asked what all the nervousness was about, and Bueno answered "No, no, no, no." Bueno then explained that he had been told that he would only have to drive to Albany, two hours away. Agent Reyes responded, "Hey, we're talking big bucks. I'm paying for this." Bueno responded "Yes ... I know-yes." Bueno then pointed to the drugs, and said "[t]here's that stuff." Agent Reyes took the drugs, asking "[i]s

everything here," to which Bueno replied yes. Agent Reyes testified that, when he asked Bueno "how much" was in the package, Bueno responded "six" (six hundred grams), though Bueno denies that the voice on the recording is his.

Bueno was arrested, along with Bautista, after getting back onto the highway following the transaction. Bautista testified that, as they sped away, Bueno exclaimed "we are caught, we are caught."

## DISCUSSION

1. *Restriction of Defense Summation*

During the summation for the defense, the district court sustained objections to arguments concerning the government's failure to corroborate the informants' testimony with, inter alia, cellular phone records or recorded conversations from the discussion at the restaurant:

> DEFENSE COUNSEL: Let's talk about what evidence there wasn't in this case ... Why didn't we get some cellular phone records in this case to support that ... they used [Bautista's] phone ... ? Why? Because they don't exist.
>
> Where are the beeper records? There aren't any, because they don't exist.
>
> \* \* \*
>
> THE GOVERNMENT: Objection, your Honor.
>
> THE COURT: Yes, sustained.
>
> DEFENSE COUNSEL: There [are] no pen registers in this case.
>
> THE GOVERNMENT: Again, objection. We are talking about the evidence that is in the case.
>
> DEFENSE COUNSEL: I am talking about what it not here.

THE COURT: Yes, and the jury shall decide the case on what is here.

Bueno assigns error to the court's "egregious misstatement of the law at the critical juncture when defense counsel was directly addressing the lack of evidence which prevented the prosecution from meeting its burden of proof."

■■■■ A district court has broad discretion in limiting the scope of summation, see Herring v. New York, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975), and a court's decision to limit the scope of summation will not be overturned absent an abuse of discretion, see Cole v. Tansy, 926 F.2d 955, 958 (10th Cir.1991). There is no abuse of discretion if the defendant cannot show prejudice, see United States v. Alaniz, 148 F.3d 929, 935 (8th Cir.1998); cf. United States v. Vasquez, 82 F.3d 574, 576 (2d Cir.1996) ("Even when we find that a court has improperly limited cross-examination, we should not reverse if we conclude that the error was harmless, or unimportant in relation to everything else the jury considered on the issue in question.").

■■■■ The absence of evidence in a criminal case is a valid basis for reasonable doubt. See, e.g., United States v. Poindexter, 942 F.2d 354, 359 (9th Cir.1991) ("In every criminal case, the mosaic of evidence that comprises the record before a jury includes both the evidence and the lack of evidence on material matters. Indeed, it is the absence of evidence upon such matters that may provide the reasonable doubt that moves a jury to acquit."). However, sustaining the objections here did not (as defendant argues) "distort[ ] and effectively lower[ ] the burden of proof," because the summation contained objectionable factual assertions that certain things not offered in evidence do not in fact exist. As conceded by the defense during oral argument in this Court, there was no basis in the record for those asser-

tions. They therefore could confuse the jury by implicating facts about which the jury heard no testimony. Cf. United States v. Warfield, 97 F.3d 1014, 1020–21 (8th Cir.1996) (defense counsel properly prevented from making closing argument regarding the timing of a meeting that could not be confirmed by record evidence because it might mislead the jury). Moreover, the summation arguments at issue amounted to an (improper) invitation for the jury to consider the government's choice of investigative techniques. See United States v. Cheung Kin Ping, 555 F.2d 1069, 1073–74 (2d Cir.1977).

In any event, defense counsel made her argument to the jury regarding the government's lack of evidence before the government's trailing objection was sustained. And any confusion as to the proper standard for weighing the evidence that might have been created by the district court's comment that "the jury shall decide the case on what is here" would have been dispelled by the subsequent charge, which repeatedly emphasized the government's (non-shifting) burden to prove its case and a criminal defendant's entitlement to a "clean slate" at the beginning of trial. In light of the record as a whole, there was no abuse of discretion in the district court's decision to restrict defense counsel's closing arguments to the evidence actually presented in the case, and certainly no error of constitutional dimension.

2. *Admission of Prior Inconsistent Statement*

Informant DeLaCruz testified about negotiations between himself and Bueno during the restaurant meeting on December 1. On cross-examination, defense counsel questioned DeLaCruz about warrants issued "just recently" for his arrest, and about pending charges on which he presumably desired the assistance of the

DEA. She asked DeLaCruz whether he had received from the government $300 on December 1, 1998, $3,500 on December 16, 1998, and $500 on February 12, 1998. DeLaCruz stated that he did not remember whether he received these particular payments, but he admitted receiving payments of $900 on September 27, 1999 and $500 on December 7, 1999.

On redirect, the government tried to counter the defense's imputations of impure motive by introducing a statement written by DeLaCruz (in Spanish), dated December 3, 1998, concerning DeLaCruz's meeting with Bueno on December 1 and the December 3 drug delivery. The court admitted the statement into evidence, and the government referenced the statement during its summation in an effort to bolster DeLaCruz's credibility.

Bueno argues that it was prejudicial error for the court to admit DeLaCruz's December 3 statement because an admission under the hearsay exception for prior consistent statements (Fed.R.Evid. 801(d)(1)(B)) requires "that the prior consistent statement was made prior to the time that the supposed motive to falsify arose." *United States v. Quinto*, 582 F.2d 224, 234 (2d Cir.1978). Here, because the first payment ($300) was made on December 1, 1998, the statement was arguably made *after* the motivation to falsify arose. (On the other hand, assuming the accuracy of the facts asserted in defense counsel's question, more than 90% of the money paid to DeLaCruz was paid *after* he made his statement. Accordingly, with respect to 90% of the payments that counsel suggested motivated him to fabricate, the statement preceded them, and therefore could not have been affected by them.)

■ Even assuming that the district court improperly admitted DeLaCruz's December 3 statement, any such error was harmless. First, Bueno's counsel was able to use the statement to point out inconsistencies between it and DeLaCruz's trial testimony and to emphasize that DeLaCruz had to give testimony consistent with his December 3 written statement in order to continue receiving cash payments. *See United States v. Hernandez*, 227 F.3d 686, 696 (6th Cir.2000) (admission of post-arrest prior consistent statement harmless because witness was cross-examined and witness's testimony was corroborated by other evidence). Second, DeLaCruz's statement presented no new substantive evidence. *See United States v. Awon*, 135 F.3d 96, 102 (1st Cir.1998) (although prior consistent statements "unquestionably had some effect" on the jury, the written statements were not detailed). Third, the evidence of Bueno's guilt was strong: two informants and a DEA Agent testified to his knowing participation in the heroin sale, and Bueno's testimony-that he had no idea why he was traveling to Watertown, in an empty car or with a package under a floor mat-is, particularly in light of the tape recorded conversations from that day, wholly unbelievable. Finally, the court delivered an instruction stating that informers' testimony must be regarded "with greater scrutiny than the testimony of an ordinary witness." This instruction dispelled any prejudice Bueno may have suffered from the introduction of the prior statement.

### 3. *Admission of 404(b) Evidence*

■ On direct examination, DeLaCruz testified about his discussion with Bueno regarding delivery of the heroin to Watertown:

> THE GOVERNMENT: Did Mr. Bueno indicate he had some familiarity with the upstate area?
>
> DELACRUZ: Yes, sir.
>
> THE GOVERNMENT: What did he tell you about that?

DELACRUZ: Mr. Bueno said that he is used to traveling upstate, so he told me that he traveled with his wife taking drugs up to upstate.

To avoid unnecessary attention to this testimony of prior bad acts, defense counsel understandably interposed no objection to DeLaCruz's response, and sought no limiting instruction. But because defense counsel did not object at trial, the "plain error" standard applies nevertheless. *See United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). But we see no error by the court. Defense counsel could have moved for a mistrial, out of the jury's presence, but did not, and therefore did not afford the court an available opportunity to do something about the problem.

Bueno argues that the government erred by failing to notify defense counsel of its intent to elicit the testimony at issue; but the government insists that the challenged testimony was elicited inadvertently, and that it never had an opportunity to explain its intentions to the court because defense counsel never objected. Bueno cannot argue that the trial judge somehow erred by failing to anticipate Bueno's response.

In any event, DeLaCruz's statement would likely have been admissible under Rule 404(b), to show Bueno's knowledge that he was involved in a drug transaction and to provide general context for events of December 3. Bueno's testimony that he never knew he was transporting heroin would have opened the door to such rebuttal evidence. *See United States v. Gonzalez–Sanchez*, 825 F.2d 572, 581 (1st Cir. 1987) (evidence of prior fires admissible in arson prosecution because, inter alia, this evidence was "especially probative of the issue whether [the defendant] was an innocent 'tool' of others or a knowing participant in the conspiracy"). Bueno responds

that DeLaCruz's testimony could not be deemed harmless on that basis because, but for DeLaCruz's statement, Bueno would not have testified. We are unconvinced, because: Bueno had no criminal record; he was evidently prepared to testify that he had no prior involvement with drugs; though he drove the drugs to Watertown, he was after all a chauffeur by trade.

In view of the additional strong evidence of Bueno's guilt discussed above, any error on the part of the government in failing to provide defense counsel with prior notice was harmless. In light of the other evidence in the case, it is "highly probable" that this error did not contribute to the verdict in the case. *United States v. Corey*, 566 F.2d 429, 432 (2d Cir.1977).

### 4. *Conscious Avoidance*

At trial, Bueno claimed ignorance that he was driving heroin to Watertown. Over defense objection, the district court charged the jury on "conscious avoidance," stating in essence that if the jury found that Bueno "deliberately closed his eyes to what otherwise would have been obvious to him," then it may find Bueno acted knowingly.

Bueno argues that this instruction was error because all of the government's trial evidence was premised on the theory of actual knowledge, and there was therefore no evidence supporting conscious avoidance. The flaw in this argument is that *Bueno* maintained at trial that he did not know what was contained in the package behind the seat of his car. It is not required that the evidence supporting such an instruction be introduced by the government rather than by the defense. *See United States v. Jacobs*, 117 F.3d 82, 98 (2d Cir.1997) ("Even when the government attempts to prove actual knowledge, an instruction on conscious avoidance can still

be proper."); *United States v. Hopkins,* 53 F.3d 533, 542 (2d Cir.1995) (government may rely primarily on evidence of actual knowledge while court also acknowledges possible finding of conscious avoidance by giving the charge).