11-2539-cr(L)
U.S. v. Lee, et al.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

August Term, 2015

(Argued: December 10, 2015   Decided: August 24, 2016)

Docket Nos. 11-2539; 11-2543; 11-2834; 11-4068

---

UNITED STATES OF AMERICA,

*Appellee*,

— v. —

HISAN LEE, also known as Ice, also known as Devontea Clark,
DELROY LEE, also known as Specs, also known as DJ, LEVAR
GAYLE, also known as Train, SELBOURNE WAITE, also known as Silky,

*Defendants-Appellants*,

HIBAH LEE, MARK GABRIEL, also known as Bubbles, BOBBY
MOORE, JR., also known as Pops, ANDRE DAVIDSON, also
known as O Dog, BOBBY SAUNDERS, also known as Bobby
Moore, CARMEN MOORE, also known as Munchie, TYRONE
MOORE, also known as Puss, ROBERT MORRISON, also known
as Chips, DAKWAN EDWARDS, also known as Doc, MARQUISH
JONES, also known as Lunchbox, MARK HART, also known as
Movements, RAHEEM TUCKER, also known as Ras, DEMETRI
YOUNG, also known as Walter Malone, CHRISTOPHER DIAZ,
also known as X Box, ANTHONY MICHAEL DIAZ, also known as
Little X, PAUL LOVE, AARON BIRCH, also known as A, KEVIN

BECKFORD, also known as Carl Beckford, JERMELL FALZONE,
also known as Mel,

*Defendants.*[*]

─────────────

B e f o r e :

CABRANES, POOLER, and LYNCH, *Circuit Judges.*

Several defendants appeal from convictions for racketeering, narcotics conspiracy, Hobbs Act conspiracy, and various substantive counts of Hobbs Act robbery and associated firearms and murder counts. In this opinion, we hold that the evidence offered at trial to prove the interstate commerce element of the challenged Hobbs Act robberies was sufficient to support the guilty verdicts, because the evidence permitted the jury to conclude beyond a reasonable doubt that the robberies targeted suspected marijuana dealers for their drugs or the proceeds from the sale of drugs. Additionally, we reject defendant Levar Gayle's due process and evidentiary challenges to his convictions resulting from the robbery and murder of Oneil Johnson. For the reasons set forth in this opinion and in an accompanying summary order, the judgment of the district court is AFFIRMED in all respects, save that Selbourne Waite's case is REMANDED for resentencing, for reasons set forth in the summary order.

AFFIRMED in part and REMANDED in part.

─────────────

B. ALAN SEIDLER, New York, NY, *for* defendant-appellant Hisan Lee.

─────────────

[*]The Clerk of Court is directed to amend the official caption to conform to the caption above.

WINSTON LEE, New York, NY, *for* defendant-appellant Delroy Lee.

RUTH M. LIEBESMAN, Paramus, NJ, *for* defendant-appellant Levar Gayle.

SUSAN V. TIPOGRAPH, New York, NY, *for* defendant-appellant Selbourne Waite.

MARGARET GARNETT, Assistant United States Attorney (Jessica Fender, Won Shin, David Zhou, Assistant United States Attorneys, *on the brief*), *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY.

GERARD E. LYNCH, *Circuit Judge*:

Several defendants appeal from convictions on various charges of racketeering, narcotics conspiracy, Hobbs Act conspiracy, and substantive counts of Hobbs Act robbery and associated firearms and murder counts. We reject most of defendants' challenges to their convictions in an accompanying summary order, in which we also conclude that defendant Selbourne Waite's case must be remanded for resentencing. In this opinion, we hold, following the Supreme Court's recent decision in *Taylor v. United States*, 136 S. Ct. 2074 (2016), that the evidence offered at trial to prove the interstate commerce element of the

3

challenged Hobbs Act robbery convictions was sufficient to support the guilty verdicts, because the evidence permitted the jury to conclude beyond a reasonable doubt that the robberies targeted suspected marijuana dealers for their drugs or the proceeds from the sale of drugs. We also reject defendant Levar Gayle's due process and evidentiary challenges to his conviction on charges arising from the robbery and murder of Oneil Johnson. We therefore AFFIRM the judgment of the district court, except to the extent that defendant Waite's case is REMANDED for resentencing for reasons set forth in the accompanying summary order.

## BACKGROUND

Hisan Lee, Delroy Lee, Selbourne Waite, and Levar Gayle appeal from judgments of conviction in the United States District Court for the Southern District of New York (Barbara S. Jones, *J.*), following a six-week jury trial. The jury found the defendants guilty of all counts against them, except that it acquitted Selbourne Waite of the counts related to the murder of Bunny Campbell. As noted above, we resolve most of the issues on appeal in the accompanying summary order. Below, we address the challenges made by all four defendants to the sufficiency of the evidence on the interstate commerce

4

element for the Hobbs Act robberies, and Gayle's arguments that the district court's rulings caused him substantial prejudice requiring reversal of his convictions in connection with the robbery and murder of Oneil Johnson.

The evidence at trial showed that Hisan Lee, his brother Delroy Lee, and their cousin Selbourne Waite were all members of a criminal organization centered around DeKalb Avenue in the northern Bronx (the "DeKalb Avenue Crew" or the "Crew"), which engaged in extensive drug dealing, violence, robberies of drug dealers, and murders. Another cousin, Levar Gayle, was not a member of the Crew, but was convicted of participating in a single drug robbery in which the victim, Oneil Johnson, was shot and killed by Hisan Lee.

The Crew was led primarily by a man named Bobby Saunders, and its activities centered on a triangle of blocks between Van Cortlandt Park and Woodlawn Cemetery. Saunders had a close "father-son" type relationship with Hisan Lee, Delroy Lee, and Waite, and gave them entry-level jobs selling marijuana and crack cocaine on his stretch of DeKalb Avenue in the early 1990s. By the late 1990s, Delroy Lee, Hisan Lee, and Selbourne Waite were all selling crack cocaine on DeKalb Avenue with other members of the Crew. Members of the Crew pooled money to buy from suppliers, split sales, and watched out for

the police for one another. By the mid-2000s, the Lee brothers and Waite were primarily involved in selling larger quantities of drugs than before, which they often secured through robberies, many of which are the subject of this appeal. The Lee brothers and Waite regularly carried guns to protect their drugs and themselves while they were selling, and to protect and enforce the exclusive territory of the DeKalb Avenue Crew. The factual background as it relates to each Hobbs Act robbery, and Gayle's involvement in the robbery and murder of Oneil Johnson, is discussed further in context below.

## DISCUSSION

### I.     Interstate Commerce Element

All four defendants challenge the sufficiency of the evidence to prove the interstate commerce element of various charged substantive Hobbs Act robberies: the robbery of Oneil Johnson, in which Johnson was shot and killed, and robberies at 4061 Murdoch Avenue, 2041 Strang Avenue, 2032 Strang Avenue, 3955 Paulding Avenue, and 2930 Hone Avenue. Accordingly, they argue that those substantive robbery convictions, as well as any firearms convictions predicated on them, must be reversed.

6

It was stipulated by the parties that all cocaine and some marijuana comes from outside the state of New York. Therefore, if the target of a robbery was cocaine or its proceeds, the interstate commerce element is clearly satisfied, since the cocaine must have been transported in interstate commerce, and a reasonable jury therefore could easily conclude that the robberies affected an interstate, if illicit, commercial operation. But the stipulation that some marijuana has traveled interstate leaves open the possibility that the marijuana targeted in any particular robbery may have been grown, processed, and sold entirely within New York State, unless the government specifically proved otherwise. Accordingly, defendants argue, citing our decisions in *United States v. Parkes*, 497 F.3d 220 (2d Cir. 2007), and *United States v. Needham*, 604 F.3d 673 (2d Cir. 2010), that evidence that the defendants' robberies targeted marijuana dealers for their marijuana (or for the proceeds from its sale) is insufficient in itself to permit a jury to find the requisite nexus with interstate commerce under the Hobbs Act, even if "the general activity [of marijuana dealing], taken *in toto*, has such an effect." *Needham*, 604 F.3d at 684.

But the *Needham* case, on which defendants primarily rely, has been abrogated by the Supreme Court's recent decision in *Taylor*, which held that

7

where the government proves that a defendant robbed or attempted to rob a marijuana dealer of marijuana or proceeds from its sale, the interstate commerce element of the Hobbs Act is satisfied. *Taylor*, 136 S. Ct. at 2077-78. Applying this new standard to the various Hobbs Act robbery convictions challenged by the defendants, we conclude that the evidence amply proved that the robberies in question affected interstate commerce within the meaning of the Hobbs Act.

## A. Applicable Law

The Hobbs Act provides in relevant part that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery . . . or attempts or conspires so to do . . . shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a). In a Hobbs Act prosecution, "it is well established that the burden of proving a nexus to interstate commerce is minimal." *United States v. Elias*, 285 F.3d 183, 188 (2d Cir. 2002). But the Act still requires proof beyond a reasonable doubt of an effect on interstate commerce. 18 U.S.C. § 1951(a) (penalizing anyone who, *inter alia*, "in any way or degree . . . affects commerce . . . by robbery").

Exactly how much of an effect on interstate commerce is required is a vexing issue. On the one hand, our cases are replete with statements that the effect on interstate commerce need only be "slight, subtle or even potential," *United States v. Perrotta*, 313 F.3d 33, 36 (2d Cir. 2002) (internal quotation marks omitted). Further, the post-New Deal standard for congressional regulatory jurisdiction under the commerce clause has been expansive. *See, e.g.*, *Wickard v. Filburn*, 317 U.S. 111, 128-29 (1942). While the Supreme Court has in recent years attempted to draw some limits to that power, *see, e.g.*, *United States v. Lopez*, 514 U.S. 549 (1995), the Court has specifically upheld expansive congressional authority over controlled substances. Most notably, because Congress has undertaken comprehensive regulation of controlled substances, based on a finding that the traffic in such substances, in the aggregate, has significant effects on interstate commerce, the Court has upheld federal prohibitions on even the personal possession or cultivation of small amounts of marijuana. *Gonzales v. Raich*, 545 U.S. 1 (2005).

As regards the interaction between this expansive federal interstate commerce jurisdiction over controlled substances and the Hobbs Act, this Circuit has followed a somewhat meandering course. We concluded in 2002 that

9

evidence that a defendant believed he was robbing the "proceeds of a drug deal" constituted "sufficient evidence to support Hobbs Act jurisdiction" as a matter of law, because "drug proceeds affect interstate commerce." *United States v. Fabian*, 312 F.3d 550, 555 (2d Cir. 2002). But in 2007, we held that even as to drug robberies, the jury was still required to make an independent finding of an effect on interstate commerce as part of its verdict. *Parkes*, 497 F.3d at 229-30. We reaffirmed the holding of *Parkes* in *Needham*, and went further, holding that to support such a jury finding, more specific proof of the effect of the particular robbery on interstate commerce is required: "In every [Hobbs Act] case, the government must prove that the alleged offense had some effect on interstate commerce — not simply that the general activity, taken *in toto*, has such an effect." *Needham*, 604 F.3d at 684. "The purpose of this requirement [was] to avoid transforming every robbery and extortion, which are quintessential state crimes, into federal offenses." *Id*. In other words, prior to the Supreme Court's recent decision in *Taylor*, the law in this Circuit was that while the evidence may be slight, there must be some evidence of an interstate nexus beyond merely proof that drugs or drug proceeds were the target of a robbery.

10

Relying on that Circuit case law, defendants argue that the evidence of an effect on interstate commerce in the robberies in this case was insufficient, because there was no evidence that any marijuana involved in the robberies derived from interstate commerce – and indeed, in some of the robberies there was no evidence that marijuana or money attributable to the sale of marijuana was obtained at all.[1]

The Supreme Court, however, has now clarified that "a robber who affects or attempts to affect even the intrastate sale of marijuana grown within the State affects or attempts to affect commerce over which the United States has jurisdiction." *Taylor*, 136 S. Ct. at 2080. In *Taylor*, petitioner Taylor was indicted on two counts of Hobbs Act robbery for his participation in two home invasions targeting marijuana dealers for their marijuana and proceeds from its sale. Taylor argued that the government had not satisfied the commerce element of the Hobbs Act, because it had not shown "(1) that the particular drugs in question originated or were destined for sale out of State or (2) that the particular drug dealer targeted in the robbery operated an interstate business." *Id.*

---

[1] The district court instructed the jury that the government was required to prove an effect on interstate commerce beyond a reasonable doubt. Except for one matter dealt with in the accompanying summary order, defendants do not challenge those instructions.

The Court rejected that argument, noting that *Gonzalez v. Raich* "reaffirmed

'Congress'[s] power to regulate purely local activities that are part of an

economic "class of activities" that have a substantial effect on interstate

commerce.'" *Id.* (quoting *Raich*, 545 U.S. at 17). The Court described its holding in

*Taylor* as "straightforward and dictated by our precedent," *id.* at 2077, stating that

its conclusion

> requires no more than that we graft our holding in *Raich*
> onto the commerce element of the Hobbs Act. The
> Hobbs Act criminalizes robberies affecting "commerce
> over which the United States has jurisdiction."
> [18 U.S.C.] § 1951(b)(3). Under *Raich*, the market for
> marijuana, including its intrastate aspects, is "commerce
> over which the United States has jurisdiction." It
> therefore follows as a simple matter of logic that a
> robber who affects or attempts to affect even the
> intrastate sale of marijuana grown within the State
> affects or attempts to affect commerce over which the
> United States has jurisdiction.

*Id.* at 2080. The Supreme Court thus held, in short, that where a robber attempts

to steal marijuana or marijuana proceeds from a marijuana dealer, proof of such

an attempt in itself supports the conclusion that the robber attempted to affect

interstate commerce, and the robber is therefore convictable under the Hobbs

Act. *See id.*

12

Applying *Taylor*, we hold that the evidence was sufficient to prove the interstate commerce element of the Hobbs Act with respect to each of the challenged robberies, because in each instance, the target was a marijuana dealer's marijuana or marijuana proceeds (or, in one instance, cocaine or cocaine proceeds).[2]

**B. Application to Particular Robberies**

"A defendant challenging the sufficiency of the evidence bears a heavy burden, because the reviewing court is required to draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury verdict." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). A jury verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

1. Robbery and Murder of Oneil Johnson

Hisan Lee and Levar Gayle argue that the government did not sufficiently prove the interstate commerce element of the Hobbs Act for the robbery and murder of Oneil Johnson, because it was unclear whether the marijuana stolen

---

[2] This opinion has been circulated to all the judges of the Court prior to filing.

during this particular robbery came from out of state.[3] Applying the general standard for challenges to jury verdicts based on sufficiency of the evidence and the specific holding of *Taylor*, we conclude that the evidence amply supports the convictions.

One of Hisan Lee's closest friends was a man named Mark Gabriel, who testified as a cooperating witness for the government. Gabriel was in a romantic relationship with Shinikwah Burke, who lived with her other boyfriend, a marijuana dealer named Oneil Johnson. Hisan Lee and others hatched a plan to rob Johnson as he returned from one of his trips out of town to buy large quantities of marijuana. They carried out this plan to rob Johnson of marijuana, and during the robbery, Hisan Lee shot and killed Johnson.

Both Gabriel and Burke testified at trial that Johnson ran a wholesale marijuana business and frequently traveled outside of New York, to Canada and Arizona, among other places, to secure large quantities of marijuana to resell to others. Gabriel also testified that Johnson was involved in the business of distributing other drugs, including cocaine, which defendants stipulated

---

[3] Gayle's other challenges to his conviction related to his involvement in this robbery will be discussed below.

14

necessarily travels in interstate commerce. Additionally, there was testimony from Shinikwah Burke that the marijuana arriving the day of the robbery was coming from Canada, although she was not positive.

Thus, even under the law of this Circuit prior to *Taylor*, the government clearly presented sufficient evidence to prove the interstate commerce element. There was evidence that Johnson frequently traveled out of state to purchase marijuana, and that his business also dealt in cocaine, which necessarily travels in interstate commerce. We recognized in *Needham* that "[i]n Hobbs Act cases, an interstate nexus may be demonstrated where the government introduces evidence that the robbery was of a business (legal or illegal) that . . . purchases 'a commodity that travels in interstate commerce.'" *Needham*, 604 F.3d at 682. Evidence that the specific money or products targeted in a robbery had traveled in interstate commerce has never been required. *See United States v. Celaj*, 649 F.3d 162, 168 (2d Cir. 2011). In light of *Taylor*, moreover, the effect on interstate commerce may be established even more simply, because it is sufficient that the robbery targeted a marijuana dealer, in an effort to obtain marijuana he was believed to be bringing back to his apartment.

2. 4061 Murdoch Avenue

Waite and Delroy Lee challenge the sufficiency of the evidence to prove the interstate commerce element for the robbery at 4061 Murdoch Ave. On January 31, 2005, Waite, Delroy Lee, and Robert Morrison carried out an armed robbery of a home on Murdoch Avenue in the Bronx. They tied up Marlene Bowley, who was present at the home to babysit her sister's child, and ransacked the house.[4]

The specific evidence relating to this robbery, and the other robberies charged in the indictment, must be viewed in light of the testimony that a primary business of the Crew was robbing drug dealers. In addition to the proof on the substantively charged robberies, the government presented a substantial amount of evidence regarding the drug robbery activity of the Crew, including Hisan and Delroy Lee and Selbourne Waite in particular. *See, e.g.* Tr. 2253-54 ("Q: What were you planning on robbing? A: Drug dealers as usual" (direct

---

[4] The government asserts, without direct citation to the record, that this was a "marijuana dealer's home," that the Crew specifically "ransacked the house *looking for drugs and money*," and that they recovered "approximately $30,000 *in narcotics proceeds*." Government's Br. 15 (emphasis added). A closer look at the evidence offered at trial shows that the government's characterization of the evidence is somewhat overstated, at least if it is taken as a description of the *direct* evidence at trial. Nevertheless, the evidence, as parsed below, is still sufficient to support the *inference* that the robbery targeted drugs and drug proceeds.

examination of Mark Gabriel)); Tr. 790-91 (explaining that drug dealers were targeted "[b]ecause normally they wouldn't call the police and they were sure money" (testimony of Keith Harry)).

As to this particular robbery, cooperating witness Jonathan Headley testified that "[t]here was a robbery on Wilder Avenue, about a female and a male, they had a nice truck. . . . [W]e were watching their house on Wilder to rob the house." Tr. 3083. He stated that "[t]here was supposed to be money, money and weed in the house." Tr. 3084. Headley testified that Morrison told him that they found "a few thousand dollars under the bed," Tr. 3085, and Headley also testified that he went to the car dealership with Waite and Morrison to buy cars using the proceeds. Another witness, Lamar Sharpe, testified that Morrison told him "that him and Silky [Waite] had already robbed that house. . . . He told me that they just got about 30,000 at the house." Tr. 3687. Sharpe also testified that he had "seen a BMW truck in front of the house and a Lexus." *Id.* Finally, Marlene Bowley testified that she had seen her sister's boyfriend, the apparent target of the robbery, with narcotics; when asked to specify which narcotics she stated that "[h]e smoke[s] marijuana . . . three times a day." Tr. 3284.

17

Taken in the light most favorable to the government, the evidence supports an inference that the robbery targeted money and marijuana. Headley's direct testimony that the robbery was undertaken because there was money and "weed" in the house, and that the robbers had seen expensive cars parked in front of the house, taken in light of evidence of the general practices of the Crew, supports a reasonable inference that the robbers believed they could obtain commercial quantities of marijuana in the house, not merely some minor quantity of the drug kept for personal consumption, and that the proceeds of the robbery – which the jury could have found amounted to as much as $30,000 – constituted drug proceeds. Looking at the evidence in its totality, the evidence is sufficient to support an inference by the jury that members of the Crew targeted the house on Murdoch Avenue because they believed that a marijuana dealer lived there who might be in possession of marijuana or marijuana proceeds. Therefore, the interstate commerce element is satisfied under *Taylor*, 136 S. Ct. at 2080.

3. 2032 Strang Avenue

Waite challenges the sufficiency of the evidence on the interstate commerce element as to another robbery. On October 4, 2004, Waite and Dwayne Brown carried out an armed robbery at 2032 Strang Avenue. According to Gabriel, who

18

had attempted to rob the same house earlier and given the location and other details to Waite, an individual living at 2032 Strang Avenue reputedly sold "large quantit[ies] of cocaine." Tr. 2335. Brown, also a cooperating witness, testified that he believed that the target was a "drug dealer who had weed [and] money." Tr. 3421. Waite and Brown entered the house, found a safe, and carried it outside, where they were confronted by an older man, who turned out to be the father of the robbery target. Waite discharged his gun in order to scare off the older man and make their escape. The safe turned out to be empty.

There is sufficient evidence to prove the interstate commerce element of this Hobbs Act robbery conviction, whether the jury believed Gabriel's testimony that the target was a cocaine dealer, or Brown's testimony that the target was a drug dealer who had marijuana and money. As stipulated at trial, cocaine necessarily moves in interstate commerce, and targeting a marijuana dealer is sufficient as a matter of law under *Taylor*. It is irrelevant that no actual drug proceeds were recovered from the safe. *See Taylor*, 136 S. Ct. at 2081 ("[I]t is enough that a defendant knowingly stole *or attempted to steal* drugs or drug proceeds, for, as a matter of law, the market for illegal drugs is 'commerce over which the United States has jurisdiction.'" (emphasis added)); *see also* 18 U.S.C.

19

§ 1951(a) (creating criminal liability for "[w]hoever in any way . . . affects commerce . . . or attempts or conspires so to do").

### 4. 2041 Strang Avenue

Hisan Lee challenges the sufficiency of the evidence to prove the interstate commerce element for the robbery at 2041 Strang Avenue. In the spring of 2003, Hisan Lee and other members of the Crew learned of a robbery target, for "a hundred," Tr. 1161, or possibly "a thousand pounds of weed" and drug money, Tr. 2293, around Wilder and Strang Avenues in the Bronx. On the day of the robbery, Hisan Lee and several others drove to the vicinity of Wilder and Strang, many of them, including Hisan Lee, armed with guns. When the presumed targets of the robbery emerged from the target house, carrying laundry bags, the Crew set upon them. Shots were fired, and the bags seized, but they contained only dirty laundry, and neither money nor drugs.

This evidence, again, is sufficient to prove the interstate commerce element under *Taylor*. There was direct evidence that the intended target of the robbery was a significant amount of marijuana, and "a robber who affects or attempts to affect even the intrastate sale of marijuana grown within the State affects or

20

attempts to affect commerce over which the United States has jurisdiction."

*Taylor*, 136 S. Ct. at 2080.

5. 3955 Paulding Avenue

Waite challenges the sufficiency of the evidence to prove the interstate commerce element of the robbery at 3955 Paulding Avenue. On March 24, 2005, Waite learned of "a drug transaction" and decided, along with Dwayne Brown, to "go and rob the two individuals of their money and their drugs." Tr. 3428. After observing what they believed to be a drug transaction in the vicinity occurring in a van, they followed the van in their vehicle until a man carrying a duffel bag and a paper bag exited the van. Brown testified that he believed the duffel bag contained "pounds of weed," Tr. 3431, and so Waite and Brown began to chase the man, who fled. Waite discharged his gun numerous times, and demanded that the fleeing man drop the bag. The man dropped the paper bag, which contained a few thousand dollars, which Waite and Brown split.

Waite and Brown intended to target a drug transaction at the outset, and as the situation unfolded, intended to steal a duffel bag they believed contained a significant amount of marijuana. Because the target was a drug transaction

involving marijuana, the evidence of the interstate commerce element is sufficient to support the conviction for Hobbs Act robbery under *Taylor*.

6. 2930 Hone Avenue

Waite challenges the sufficiency of the evidence to prove the interstate commerce element of the robbery at 2930 Hone Avenue. On June 9, 2005, Waite and two others attempted to rob individuals who they believed were wholesale marijuana dealers. The target of the robbery was again described as "[p]ounds of weed." Tr. 3440. Waite and the others were waiting outside of the targeted home when an SUV pulled up and a few men began unloading shopping bags from the vehicle. According to trial testimony, one of Waite's accomplices slipped on oil in the street, and his gun accidentally fired, which caused the other accomplice to begin firing as well. In the confusion, Waite and the others managed to leave with a few of the bags, but they contained only clothing, and no drugs or money were recovered. Once again, there was sufficient evidence under *Taylor* to prove the interstate commerce element, as the intended target was "[p]ounds of weed." Tr. 3440.

22

**C. Conclusion**

In conclusion, we hold that the evidence was sufficient to satisfy the interstate commerce element of the challenged Hobbs Act robberies, because the jury could easily have found that the robberies targeted marijuana (or cocaine) dealers' drugs or drug proceeds. We therefore affirm the convictions for these counts (and the accompanying counts charging firearms violations, which defendants challenge only on the theory that the predicate Hobbs Act robberies were not sufficiently proved).

## II.    Levar Gayle

Levar Gayle was charged both with conspiring to commit and committing the Hobbs Act robbery of Oneil Johnson in violation of 18 U.S.C. § 1951, and with related firearm offenses in violation of 18 U.S.C. §§ 924(c) (using and carrying a firearm in connection with a crime of violence) and 924(j) (causing the death of a person through the use of a firearm in connection with a § 924(c) violation). He was convicted of all counts against him and was sentenced principally to 240 months' incarceration. Gayle was not a member of the DeKalb Avenue Crew and was not charged with participating in any crimes other than the robbery and murder of Oneil Johnson.

23

Gayle does not argue that the evidence was insufficient as a matter of law. Rather, he argues that, given the weakness of the case against him, the district court's denial of his motion to sequester ATF Agent Michael Zeppieri during trial, and its admission of Agent Zeppieri's testimony about an incriminating statement he claimed to have only recently remembered, which allowed the government to bolster the theory that he had been involved in planning of the Johnson robbery, was prejudicial and requires reversal.

**A. The Case Against Gayle at Trial**

The case against Gayle was presented principally through five witnesses: Special Agent Eric Murray and NYPD Detective James Conneely (who testified to Gayle's self-incriminating statements), Agent Zeppieri, and cooperating witnesses Mark Gabriel and Shinikwah Burke.

Gabriel testified that he planned the robbery with Hisan Lee, Hibah Lee, and Burke, Johnson's live-in girlfriend, on the same day that the robbery occurred, and that Gayle was not present at the planning meeting. The plan was to rob Johnson when he returned from the trip he was on to buy a large quantity of marijuana. Johnson called Burke when he was close to home, Burke informed Gabriel that Johnson was near, and she then left to go see a movie. Gabriel went

24

to the store to buy a pack of cigarettes, and when he returned, "Levar and a girl" were at the house. Tr. 2315. Gabriel testified that "it was surprising because I didn't expect anybody else to be there." Tr. 2315. Gabriel testified that Hisan Lee told him that he had summoned Gayle so that Lee could "have another ride," Tr. 2633. Gabriel and the others, including Gayle, began speaking about the robbery. Gayle left for about five minutes to drive the girl home, and returned ten to fifteen minutes before Johnson returned to the apartment. Gabriel testified that the plan was originally to point a gun in Johnson's face, then tie him up and take his marijuana, but that after Gayle's arrival, the plan changed to Hisan Lee and Gayle "abduct[ing] [Johnson] and taking over from there by tying him up." Tr. 2476-77. Gabriel testified that when Johnson pulled up outside, "Hisan and Levar took the stairs," while he and another went to the kitchen, Tr. 2318-19, and that Gayle was armed with a ".25." When Johnson entered the apartment, Hisan Lee shot Johnson in the chest, though there was apparently no plan to do so, and Hibah Lee called 911 from Gayle's phone. Gabriel testified that he left the scene alone in Johnson's car, and drove it back to DeKalb Avenue to meet Hisan and Hibah Lee, Gayle, and Burke. Gayle drove Hisan and Hibah Lee to DeKalb Avenue in his car and left. The stolen marijuana was split among Saunders, the

25

group's mentor, Hisan and Hibah Lee and Gabriel on DeKalb Avenue on the day

of Johnson's death. Burke was given about $1,500.

Detective Conneely arrested Gayle in connection with the murder of

Johnson and testified to Gayle's post-arrest statements about the robbery.

Detective Conneely testified that Gayle stated that after arriving at what he

thought was a party, he learned about a plan to rob a marijuana dealer and

agreed to participate, and that someone was shot during the robbery. He testified

that Gayle told him he wiped off CDs so as not to leave his fingerprints, and that

Hibah Lee used Gayle's phone to make a 911 call. Gayle then drove Hibah Lee

and another man to DeKalb Avenue. Agent Murray, who was also present when

Gayle made statements to law enforcement during and after the arrest, testified

similarly to Gayle's statements. The agents also asked Gayle to give a written

statement:

> Hisan call, come over we have girls over here. When I
> got there, it was a different story. He wants to eat the
> man's food (rob him). When he [Johnson] got there the
> lights was out. (I was at the stair when he came in.)
> Then Hisan pulled a gun out and shot him (1 time). I
> was in shock. So I wiped the DVD down that I was
> watching and I ran out of the house. Went to my car
> where Hibah come in and called 911 from my cell

> phone. I threw the cell phone out of the car (Cadillac)
> and dropped him off then I went home.

Gayle App'x 106-08.[5]

Shinikwah Burke testified that on the day of the robbery, Gabriel, Hisan and Hibah Lee, were at her house, along with others, including an unidentified, dark-skinned, heavy-set man of five foot ten or five foot eleven, whom Burke had met once before.[6] They all had a discussion about the "best way to rob [Johnson]." Tr. 2796. Burke was not present for the actual robbery.

After Burke's direct testimony, Agent Zeppieri informed prosecutors that he had just remembered that on the day Burke and Gayle were arrested, Gayle briefly encountered Burke while the two were being processed in the pretrial detention area of the courthouse, and Gayle asked Agent Zeppieri, "[W]hat is Sh[i]nikwah doing here?" Tr. 4214-15. The district court allowed Zeppieri to testify to that effect, over defense counsel's objection that the late disclosure of

---

[5] We have made minor spelling/grammatical corrections to Gayle's written statement for clarity.

[6] There is no direct evidence that Gayle was one of these individuals. Burke was not asked to identify Gayle during the trial, and Gayle's defense counsel was informed before sentencing that she was not able to identify him in a photographic array after the trial.

the information would be prejudicial. The government argued in summation that this testimony was "additional proof that Levar Gayle was part of the planning of [the] robbery" of Johnson. Tr. 4711. Gayle's counsel contended in her closing argument that Agent Zeppieri had manufactured Gayle's statement recognizing Burke to shore up a weak case.

**B. Failure to Disclose Gayle's Post-Arrest Recognition of Burke**

Gayle contends that the government violated Federal Rule of Criminal Procedure 16 by failing to disclose his post-arrest statement before trial, that this discovery violation required exclusion of the statement at trial, and that the admission of the statement over his objection violated due process and caused him substantial prejudice warranting a new trial. Gayle argues that the case against him was weak, and that for that reason, "half way into the trial, Zeppieri suddenly 'remembered' a statement he claim[ed] Gayle made on the day of his arrest." Gayle Br. 72. And because this statement was not disclosed to defense counsel until the middle of trial, Gayle argues that "[i]t affected the way in which the defense prepared, opened to the jury, and cross-examined its witnesses." *Id.* He argues that the district court's decision to allow Agent Zeppieri's testimony over Gayle's objection caused substantial prejudice, because the statement

28

"connected Gayle to the woman who planned the Hobbs Act robbery." *Id.* at 88 (emphasis removed).

Pursuant to Rule 16 of the Federal Rules of Criminal Procedure, upon a defendant's request the government is obligated to "disclose to the defendant the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial." Fed. R. Crim. P. 16(a)(1)(A). If the government violates this disclosure obligation, "[a] district court has broad discretion in fashioning a remedy . . . , including ordering the exclusion of evidence." *United States v. Salameh*, 152 F.3d 88, 130 (2d Cir. 1998); *see* Fed. R. Crim. P. 16(d). "A district court's decision not to exclude evidence that was the subject of a Rule 16(a) violation is not grounds for reversal unless the violation caused the defendant 'substantial prejudice.'" *Salameh*, 152 F.3d at 130. Substantial prejudice "mean[s] more than that the statement was damaging to the defendant: the defendant must demonstrate that the untimely disclosure of the statement adversely affected some aspect of his trial strategy." *United States v. Adeniji*, 31 F.3d 58, 64 (2d Cir. 1994). Specifically, "Rule 16 is concerned with the prejudice resulting from the government's untimely

disclosure of evidence, rather than with the prejudice attributable to the evidence itself." *United States v. Sanchez*, 912 F.2d 18, 23 (2d Cir. 1990).

The government does not contest that the failure to disclose the statement in advance of trial violated Rule 16.[7] We therefore assume *arguendo* that it did, and address only whether the district court abused its discretion in admitting the statement despite the putative Rule 16 violation. In considering whether the district court abused its discretion, we look to "the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." *United States v. Pineros*, 532 F.2d 868, 871 (2d Cir. 1976) (quoting Fed. R. Crim. P. 16 advisory committee's note to 1966 amendment, *reprinted in* 39 F.R.D. 69, 178 (1966)). Applying these factors, we conclude that the district court did not abuse its discretion by allowing the government to introduce Gayle's statement.

---

[7] Rule 16 requires the government to disclose, upon a defendant's request, "any relevant oral statement made by the defendant, before or after arrest, *in response to interrogation.*" Fed. R. Crim. P. 16(a)(1)(A) (emphasis added). The statement as described by Agent Zeppieri was spontaneous, and not a response to interrogation by a government agent, but the government does not argue that it was therefore not required to disclose the statement – an argument we accordingly do not address – instead arguing only that the admission of the statement was not an abuse of discretion.

First, the government asserts no other reason in its brief for not disclosing the statement in advance of trial other than that Agent Zeppieri "remembered" it only after Burke's direct examination.[8] Gayle argues that the real reason for the late disclosure is that the "Shinikwah" statement was made up by Agent Zeppieri during trial to shore up a weak case. But he was allowed to argue this theory to the jury, who either did not believe it, or believed that the statement was fabricated but that the remaining evidence convinced them of Gayle's guilt beyond a reasonable doubt in any event. If the government failed to disclose Gayle's statement because it was not written down anywhere and Agent Zeppieri had forgotten it, the statement was not intentionally suppressed by Zeppieri or the prosecutors; nevertheless, even on this account, the failure to identify the statement as evidence to potentially be introduced at trial and to be disclosed to the defense was at best negligent.

---

[8] The parties stipulated before the jury that, if called as a witness, AUSA Elizabeth Maringer, who was not involved in the trial, would testify that she recalled being told by Agent Zeppieri on the day of Gayle's arrest that Gayle and Burke had seen each other in the courthouse, and that, if called as a witness, AUSA Michael English, the lead prosecutor on the trial, would testify that he did not recall learning of Gayle's alleged statement until after Burke had testified at trial.

Second, as to the prejudice caused, we do not find that the admission of this statement caused Gayle substantial prejudice. Gayle argues that "[a] statement that purported to place Gayle in the middle of th[e] planning [of the Johnson robbery] would have substantially impacted the entire manner in which the defendant managed his defense." Gayle Br. 90. But the fact that Gayle recognized Burke is *not* akin to "plac[ing] Gayle in the middle" of planning the robbery. The statement suggests that Gayle knew Burke. The jury could have drawn many other inferences about how Gayle came to know her. There was evidence that Gayle's cousins Hibah and Hisan Lee came by her house almost every day to drink, hang out and watch television, and he could have met her, or had her pointed out to him, in any number of ways.

It is difficult to see how the admission of the "Shinikwah" statement could have "substantially impacted the entire manner in which the defendant managed his defense." Gayle Br. 90. Gayle's attorney opened on the theory that Gayle thought he was going to a party on the night that Oneil Johnson was murdered. Gayle argues that his alleged post-arrest recognition of Shinikwah Burke contradicted this theory because it connected him to Burke. That Gayle knew Burke, however, does not undermine his theory that he thought he was going to

32

a party at her house. Indeed, that theory is entirely consistent both with Gayle's own alleged admissions (which stated that Gayle at first believed he was going to the house to meet "girls," and only learned of the robbery plan after he arrived), and with Gabriel's testimony that Gayle was not present for the initial planning session, and agreed to participate in the robbery only after he arrived on the scene. If Gayle's attorney had claimed that Gayle had never met Burke, and therefore could not have participated in the planning, perhaps Zeppieri's testimony would have caused prejudice. But that was not his defense, and Gayle does not explain how his defense strategy would have changed had he known about the "Shinikwah" statement sooner, other than to assert that it would have been different. Gayle thus has not demonstrated that the late timing of the disclosure of the remark affected his trial strategy, which could in turn show substantial prejudice.

Third, as to other measures to rectify the prejudice, Gayle declined the district court's offer to hold a hearing regarding the statement prior to its admission at trial. That option would have given Gayle additional discovery regarding the reasons for the failure to disclose the statement and the circumstances surrounding the making of the statement, the awareness of

33

government personnel regarding the statement at different times, and the fortuitous recovery of the witness's memory of the statement. Such a hearing might have affected the district court's exercise of its discretion if additional troubling facts had been elicited, and would have given his attorney additional preparation for cross-examination. At trial, moreover, Gayle had ample opportunity to cross-examine Agent Zeppieri about the statement and the circumstances of the agent's sudden recollection, and to argue to the jury that Zeppieri had fabricated the statement in order to bolster the government's case.

Finally, Gayle's argument rests in large part on his assertion that the case against him was weak, and therefore that the government's case must have hinged on this "critical" statement. But the case was not as weak as Gayle suggests, nor was the statement so critical: Gabriel testified in detail that Gayle participated in the robbery, and Gayle's own post-arrest statements corroborate at a minimum that he was present and that he knew in advance of the plan to rob Johnson. He need not have participated in the earlier planning session to be guilty of the conspiracy and robbery counts, because all "the government must prove [is] that he knew of the conspiracy and joined it with the intent to commit the offenses that were its objectives, . . . [and] [t]he agreement that is the gist of

34

conspiracy may be tacit rather than explicit . . . ." *United States v. Zhou*, 428 F.3d

361, 370 (2d Cir. 2005) (internal quotation marks omitted). And indeed, the

government's chief witness, Gabriel, testified that Gayle was *not* at the earlier

planning meeting and that Burke had left the scene before Gayle arrived.

Nor was the "Shinikwah" statement particularly damning evidence. It

could have led the jury to infer, as the government argued, that Gayle had met

Burke during the planning of the robbery. But given Gayle's close relationship to

the Lee brothers and their connections to Burke, he could have met or seen her on

any number of other occasions. And the inference that Gayle had participated in

the earlier meeting to plan the robbery directly contradicted the account of the

government's principal cooperating witness.[9]

---

[9] We do not suggest that the government's case was overwhelming. It depended
heavily on the testimony of a cooperator, Gabriel, who was subject to credibility
attacks. But Gabriel's testimony was bolstered by evidence that Gayle had
admitted the essential outlines of Gabriel's story, and the defense theory that
Gayle played no role in the robbery implies that someone involved in the robbery
had invited Gayle to the scene where he would essentially be an extraneous
witness, and then allowed Gayle to stay without any agreement that he would
participate in, or at least an agreement that he would not interfere with, the
planned crime. In short, while there was certainly a viable defense, the
prosecution was hardly in such desperate straits as to require the sudden
invention of a false – and not particularly incriminating – additional statement.

Thus, while this piece of evidence may have slightly supported the government's theory that Gayle agreed to participate in the robbery, its admission could hardly have altered the dynamic of the trial, or changed the basic defense theory – to which Gayle's post-arrest admissions essentially committed him – that Gayle had arrived at what he expected to be a social gathering, and learned too late that he had arrived at the scene of a planned robbery in which he did not participate. We therefore conclude that the late disclosure of the statement during trial did not substantially prejudice the defense so as to require reversal, and that the district court did not abuse its discretion in allowing the testimony. For the same reasons that the district court did not abuse its discretion in allowing the testimony, the admission of the statement did not violate the Due Process Clause. *See United States v. Tin Yat Chin*, 476 F.3d 144, 146 (2d Cir. 2007); *see also United States v. Conder*, 423 F.2d 904, 911 (6th Cir. 1970) ("[T]he disclosure required by Rule 16 is much broader than that required by the due process standards of *Brady*.").

**C. Objection to Defense Summation**

Gayle argues that "[c]ompounding the prejudice from allowing Zeppieri to testify to Gayle's alleged spontaneous declaration was the Court's prohibiting

defense counsel from arguing to the jury that Zeppieri was an interested witness." Gayle Br. 91. "A district court has broad discretion in limiting the scope of summation, and a court's decision to limit the scope of summation will not be overturned absent an abuse of discretion. There is no abuse of discretion if the defendant cannot show prejudice." *United States v. Bautista*, 252 F.3d 141, 145 (2d Cir. 2001) (internal citations omitted).

During summation, Gayle's counsel stated that "it is Agent Zeppieri's job as a case agent to come up with a theory of the case and then he sets out to prove it. . . . [H]is job is to obtain a conviction of the defendants on trial." Tr. 4843. The district court sustained the government's objection to this statement and directed the jury to disregard it. That ruling was not an abuse of discretion. Contrary to Gayle's argument on appeal, the statement to which an objection was sustained was *not* an argument that the agent was an interested witness, but rather was the inaccurate statement that a law enforcement officer's job is "to obtain a conviction of the defendants on trial." Moreover, minimal prejudice resulted from the district court's instruction to the jury to disregard that particular statement. Gayle's counsel was allowed to argue extensively to the jury during summation that Agent Zeppieri "made up" the statement regarding Burke

37

mid-trial "when the government's case they had against Levar Gayle turned out not to be as strong as they'd like it to be." Tr. 4839.

Accordingly, we find no prejudicial error in the district court's ruling.

**D. The Case Agent's Exemption From Witness Sequestration**

Gayle also argues that the district court erred in denying his request to sequester Agent Zeppieri during the entirety of the trial, and that because Agent Zeppieri was present for the trial, he could see its weaknesses, and based on his observations was able to "bat clean-up" and "tailor[] his testimony to fix the holes in the prosecution's case" by fabricating the "Shinikwah" statement. Gayle Br. 100. The argument is without merit.

"At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony." Fed. R. Evid. 615. However, this general rule has an exception for a witness who is "an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney." Fed. R. Evid. 615(b). We have previously held that in accordance with this rule, the district court has "discretion to exempt the government's chief investigative agent from sequestration, and it is well settled that such an exemption is proper under Rule 615[b], deeming the agent-witness a

38

'representative' of the government." *United States v. Rivera*, 971 F.2d 876, 889 (2d Cir. 1992) (internal citations omitted). Therefore, the district court did not err by exempting Agent Zeppieri from sequestration as the case agent.

## CONCLUSION

Accordingly, for the foregoing reasons, and for those set forth in the accompanying summary order, we AFFIRM the judgment of the district court in all respects, save that, for reasons described in the summary order, we REMAND to the district court for the limited purpose of resentencing Selbourne Waite.